DOWNEY, Judge,
dissenting:
By Petition for Writ of Certiorari petitioners seek review of a discovery order entered by the trial court in an action for defamation.
Respondent Thomas A. Pledger sued petitioners Burnup & Sims, Inc., and Nick A. Caporella for damages allegedly arising from defamatory statements made by the petitioners. According to the complaint, Caporella, president and chief executive officer of Burnup & Sims, caused the preparation of a writing that, in essence, falsely charged Pledger, former president of Burn-up & Sims, with accepting personal benefits from Victor Posner to perform his corporate duties in a manner that injured the corporation financially. The complaint also alleged that: (a) on June 25,1976, Caporella made a telephone conference call to the presidents of fourteen other corporations and read the allegedly false writing to them as part of a plan or design to discredit Pledger, and (b) petitioners (in furtherance of their plan to discredit Pledger) made an attempt to serve the writing “as an alleged complaint upon Victor Posner in the State of New York on June 28, 1976.”
In its answer Burnup & Sims admitted the preparation of a complaint to be filed in New York State, and it admitted “placement of a telephone call on June 25, 1976, to other high executives within its corporate sphere . . . .”
During the course of deposing Caporella, Pledger’s counsel asked Caporella a number of questions which were objected to by Burnup & Sims and Caporella on the ground that they violated the attorney-client privilege, and Caporella refused to answer them.
In considering Pledger’s motion to compel discovery the trial court had before it Capo-rella’s deposition and Caporella’s affidavit filed in opposition to the motion to compel. With reference to the telephone conference call on June 25, 1976, the affidavit states in pertinent part:
“2. On Friday, June 25, 1976, and pri- or to that date I was engaged in consultation with Messrs. White & Case with respect to the question of whether a suit should be filed against Victor Posner. On that day, I placed a call to the heads of the various operating subsidiaries of Burnup & Sims in order to consult with them with respect to the advisability of bringing such a suit. I needed their judgment as to the effect of the bringing of such a lawsuit on the company’s overall business prospects and its customers. This conversation revolved around the factual background of the suit, legal advice regarding the suit received from White & Case, and litigation strategy with respect to this case. As I state in my deposition (pp. 54-56) the persons participating in the telephone were myself, Mr. William Mercurio, the Vice-President-Finance and a director of Burnup & Sims, Inc., Mr. Riley Sims, Chairman of the Board of Directors of Burnup & Sims; Mr. Norwood Wilson, President of Green Bank Services; Mr. James Hall, President of Georgia Electric; Mr. Mike Gay-lor, President of Smith-Sweager, Inc., Mr. William Deviney, Jr., President of Devi-ney Construction Company; Mr. Harold Pitman, President of Pitman & Pitman; Mr. Robert Caporella, President of BSI, Inc.; Mr. Andy Pitman, President of W. I. Pitman; Mr. Robert Stein, President of Burnup & Sims Florida Group 1; Mr. Robert Gruño, President of Burnup & Sims Florida Group 2; Mr. Ronald Rose-man, President of West Coast Line; Mr. Fred Wehmeyer, President of Southeastern Printing Company; Mr. David Pen-land, President of T. L. Buysard. At the time of the call, Mr. Mercurio, Mr. Sims and I were directors of Burnup & Sims and all of the other persons on the call were being invited to consider membership on Burnup’s Board of Directors. Mr. Norwood Wilson, Mr. James Hall, Mr. Leo Hussey, Mr. Harold Pitman and Mr. David Penland have become Directors since June 25.”
*87 With regard to the relation of Burnup & Sims to its subsidiaries the affidavit states:
“3. It should be noted that Burnup & Sims itself is not an operating company, but is rather a legal vehicle (holding company) which owns all of the stock of thirteen separate subsidiaries, collectively, which constitute the operating business of Burnup & Sims. The holding company itself has but four officers, a Chairman, a President, a Vice President-Finance-Secretary and a Treasurer, and occupies modest headquarters (a converted grocery store) in West Palm Beach, Florida. From a practical business standpoint, presidents of the company subsidiaries — through which all of the company’s operations are conducted — are senior management officials of the business enterprise. Viewing Burnup & Sims on a basis comparable to most other business corporations not involving the holding company format, the presidents operating its subsidiaries would be senior divisional heads responsible for the company’s distinct profit centers. Were it not for the holding company format, each of these individuals would probably have the title of Executive Vice President of Burnup & Sims. Thus, in a very real sense they are the backbone of the senior management and decision making group that controls the company’s business.
“4. The nature of Burnup & Sims’ business as primarily a service company, providing the personnel and equipment necessary for a broad range of installation and maintenance work, adds a further important dimension to the participation of the subsidiary presidents in the company’s decision to commence litigation against Victor Posner. Because these key men, with their invaluable experience, personal contacts with important customers and so forth, would be so vitally interested in and indeed affected by the decision to oppose or not oppose a takeover by the raider, Victor Posner, and also because all of them were being invited to consider membership on the company’s Board of Directors, their participation in the management decision whether or not to commence the litigation was essential.”
The court denied the motion to compel discovery in part and granted it in part, specifically requiring Caporella to answer the following questions:
il * * * *
“h. Tell me what conversation you had when you called those people on the conference call?
“i. Did you instruct Mr. Mercurio to read portions of the complaint to these people?
“j. Mr. Caporella, I ask you, as the individual defendant, to tell us what you told these people in this conference call.
“k. Did you read or did Mr. Mercurio read any portions of the No. 2 complaint in this conference call?
“1. Did Mr. Mercurio read in this conference call anything comparable in substance to Paragraphs 5 and 7 of Plaintiff’s Exhibit 1, which you have looked at before?”
I find no problem with the trial court’s order relative to questions i, k, and 1. Whether or not the conference call included a reading to the subsidiary heads of portions or all of a proposed complaint does not appear to me to involve any invasion of the attorney-client relationship. However, requiring Caporella to tell “what conversation you had when you called these people on the conference call” could well do so. If, as alleged in his affidavit, Caporella discussed communications between Burnup & Sims and White & Case, the corporation’s counsel, relative to that litigation, then question K would surely be an invasion of the attorney-client relationship. It is, of course, true that no lawyer was involved in the telephone conference. However, considering that Burnup & Sims is a corporation and the people involved in the conference were officers, directors, or persons in managerial positions assisting the corporate head in making a serious corporate decision, the privilege should extend to that conversation. This is not totally unlike a corporate *88 officer conferring with counsel on behalf of the corporation and then returning to discuss that advice with the corporate Board of Directors. Surely such a discussion would not denude the legal advice of the privileged protection, and there is no contention here that the attorney-client privilege does not apply to corporations. It clearly does. See Radiant Burners, Inc. v. American Gas Association, 320 F.2d 314 (7th Cir. 1963); Annot: Privilege-Attorney-Corporate Client, 98 A.L.R.2d 241.
Accordingly, I would grant the Petition for Writ of Certiorari and direct the trial court to deny the motion to compel as to questions h and j.